Ron **LITTERER** and Ed **Wiederstein,**
Appellants,

v.

Patty **JUDGE,** Secretary of
Agriculture, Appellee.

No. 00–1659.

Supreme Court of Iowa.

May 8, 2002.

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, and Julie F. Pottorff, Deputy Attorney General, for appellee.

CADY, Justice.

The petitioners in this action requested the Iowa Secretary of Agriculture to adopt an administrative rule to require all gasoline sold in Iowa to contain ten percent ethanol. The Secretary denied the request after determining she had no legal authority to adopt the rule. The district court affirmed the Secretary's decision on judicial review. On appeal, we conclude the rulemaking authority of the secretary of agriculture does not extend to the promulgation of a rule requiring motor fuel to contain ten percent ethanol. We affirm the district court.

## I. Background Facts and Proceedings.

In August 1999, a group of sixteen individuals filed a petition for rulemaking with the Iowa Secretary of Agriculture, Patty Judge. The petitioners included Charles Grassley, Ron Litterer, Ed Wiederstein, Kyle Phillips, and twelve Iowa state legislators. Grassley is a United States Senator from Iowa. Litterer was president-elect of the Iowa Corn Growers Association. Wiederstein was president of the Iowa Farm Bureau Federation. Phillips was president of the Iowa Corn Growers Association.

The group requested Secretary Judge to amend departmental rule 21—85.33 to mandate all motor vehicle fuel sold in Iowa contain ten percent ethanol. Under the proposed rule, the ten percent ethanol requirement would be mandated by requiring motor fuel sold in Iowa to meet both the American Society for Testing and Materials (ASTM) specifications under ASTM D4814-98 (Automotive Spark–Ignition Engine Fuel) and the specifications and maximum volume of ethanol allowed under ASTM D4806-98.[1] The petition claimed

---

1. The petition requested Secretary Judge to amend Iowa Administrative Code rule 21—85.33 (1988) as follows:

   **Motor vehicle fuel and antifreeze tests and standards.** In the interest of uniformity, the tests and standards for motor vehicle fuel, oxygenate octane enhancers, raffinate natural gasoline and motor vehicle antifreeze shall be those established by the American Society for Testing and Materials (A.S.T.M.) ~~in effect on January 1, 1990, except that the standards for E grade denatured fuel ethanol shall be the American Petroleum Institute's (API) specification in~~

the rule would boost the Iowa economy, benefit the environment, and reduce dependence on foreign energy.[2]

Prior to responding to the petition, Secretary Judge asked Attorney General Thomas J. Miller if she had the authority to promulgate the requested rule. In a written response dated September 28, 1999, Attorney General Miller concluded Secretary Judge had no legislative authority to promulgate the ten percent ethanol mandate. The Attorney General also expressed concerns that such a rule could have federal statutory and constitutional implications.

On September 28, 1999, Secretary Judge wrote a letter to the petitioners denying the petition for rulemaking on the basis that she had no legal authority to promulgate the rule. She indicated in a supplemental response that she would have acted "favorably on the petition" if she had the legal authority.

Two of the petitioners, Litterer and Wiederstein, filed a petition for judicial review with the district court. In the petition, they asked the court to determine whether the secretary of agriculture had the rulemaking authority to adopt the ten percent ethanol rule.

The district court declined to address the issue whether the secretary of agriculture was authorized to promulgate the ten percent ethanol rule. The district court found its standard of review under Iowa Code section 17A.7(1) (Supp.1999) confined its inquiry to the question whether Secretary Judge denied the petition for rulemaking "in writing on the merits." The district court found that a denial based on lack of legal authority constituted a denial "on the merits."

Litterer and Wiederstein appeal. They claim the district court erred in failing to determine whether the secretary of agriculture had the legal authority to adopt the proposed rule. They also assert the secretary of agriculture is empowered to promulgate the rule, and the case should be remanded to the secretary of agriculture to permit her to exercise her discretion.

## II. Standard of Review.

Our review of rulings on a petition for judicial review is for correction of errors at law. *Greenwood Manor v. Iowa Dep't of Pub. Health,* 641 N.W.2d 823, 830 (Iowa 2002). We apply the standards of review found in Iowa Code section 17A.19(10) to the agency action to "determine whether our conclusions are the same as those made by the district court." *Scott v. Iowa Dep't of Transp.,* 604 N.W.2d 617, 619 (Iowa 2000) (referencing section 17A.19(8), which contained the standards of review prior to the 1999 amendments to

---

use at the Iowa terminals. in effect on January 1, 1999, except that the standards for motor vehicle fuel sold in Iowa must meet both the specifications for A.S.T.M. D4814–98 and the specifications and maximum volume allowed under A.S.T.M. D4806–98.
ASTM D4806–98 sets forth the standard specification for denatured fuel ethanol for blending with gasolines for use as automotive spark-ignition engine fuel. The scope of the specification indicates it covers ethanol intended to be blended with gasoline at one to ten volume percent. *See* ASTM D4806–98(1)(1.1) (1998).

**2.** Virtually all motor fuel is imported into Iowa. Petitioners claimed in their petition for rulemaking that a ten percent ethanol blend would reduce oil imports by 2.4 million barrels per year and, consequently, keep approximately $45 million in Iowa. They also alleged in their petition that a ten percent ethanol blend would improve air quality by reducing carbon monoxide, nitrogen oxides, and particulate emissions. They further alleged ethanol would displace more toxic octane enhancers.

section 17A.19); *accord Greenwood Manor*, 641 N.W.2d at 830 (same).

## III. Review of Agency Action Involving Rulemaking.

Any person "aggrieved or adversely affected by agency action may seek judicial review...." Iowa Code § 17A.19. One type of agency action is rulemaking. *Id.* § 17A.2(2); *Greenwood Manor*, 641 N.W.2d at 833 *Cmty. Action Research Group v. Iowa State Commerce Comm'n*, 275 N.W.2d 217, 219 (Iowa 1979). Rulemaking is a process by an agency "for adopting, amending, or repealing a rule" of the agency. Iowa Code § 17A.2(12). Clearly, agency action includes the denial of a petition for rulemaking. *See id.* § 17A.2(2); *id.* § 17A.2(12).

■ Under section 17A.7(1), any person may petition an agency to request "the adoption, amendment, or repeal of a rule." If the petition is denied, the agency is required to state "its reasons for the denial" in writing within sixty days after the petition is submitted. *Id.* If an agency fails to follow this procedure, judicial review is available to require the agency to perform its duty. *Schmitt v. Iowa Dep't of Soc. Servs.*, 263 N.W.2d 739, 743 (Iowa 1978) (citing Arthur Earl Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, The Rulemaking Process*, 60 Iowa L.Rev. 731, 894 (1975) [hereinafter Bonfield] (agency failure to conform to section 17A.7 is reviewable under chapter 17A's judicial review provisions)).

The scope of our review in rulemaking cases is confined by section 17A.7. When rulemaking has been denied, judicial review is narrowed to determining whether the denial was "in writing [and] on the merits." Iowa Code § 17A.7(1). Thus, the question we first confront in this case

relates to the meaning of the phrase "on the merits." If the written denial for rulemaking by the secretary of agriculture in this case was "on the merits," our review is complete and it is unnecessary to inquire into the substantive issue concerning the actual authority to adopt the rule.

■ We have previously examined the meaning of the phrase "on the merits" contained within section 17A.7(1). In *Community Action*, we relied on the helpful guidance of an article by Professor Arthur Earl Bonfield from the University of Iowa law school in construing this unique provision. *Cmty. Action Research Group*, 275 N.W.2d at 219; *see* Bonfield, 60 Iowa L.Rev. at 892–95. In doing so, we recognized the purpose of the "on the merits" requirement was to force agencies, in the exercise of their discretion, to engage in a "reasoned consideration" of the rulemaking request. *See Cmty. Action Research Group*, 275 N.W.2d at 220 (citing Bonfield, 60 Iowa L.Rev. at 892). The purpose was not to limit agency discretion in any way, but only to assure petitioners that their requests were given "fair consideration." *Id.* at 219 (citing Bonfield, 60 Iowa L.Rev. at 895). Thus, the "on the merits" requirement does not require an agency to actually "take a stand on the substantive issues" behind the request for rulemaking. *Id.* at 220. Instead, the agency may rely on reasons other than the actual merits of the request. *See id.* In *Community Action*, we found the surrounding unresolved public debate on the issue was a sufficient reason under the "on the merits" requirement. *Id.* More recently, we found practical considerations such as the needed flexibility in some types of agency action constituted a denial for rulemaking "on the merits." *See Bernau v. Iowa Dep't of Transp.*, 580 N.W.2d 757, 766 (Iowa 1998).

■ The purpose of the "on the merits" requirement also relates to judicial review. Professor Bonfield has observed that the requirement facilitates judicial review in determining whether "any of the agency's proffered reasons for failing to act are facially inadequate, unreasonable, or otherwise improper." Arthur Earl Bonfield, *State Administrative Rule Making* § 6.18.2, at 431 (1986); *accord* Bonfield, 60 Iowa L.Rev. at 895. Clearly, the task of reviewing courts is not to "question the wisdom" of the reasons provided for the denial of rulemaking, but to recognize the discretion of the agency to determine whether a rule should be adopted, changed, or continued. *See Cmty. Action Research Group*, 275 N.W.2d at 220. Yet, reasons must be provided so reviewing courts can at least determine that the discretion was exercised. We observe this same approach is followed in our review of discretionary actions in other types of cases, such as sentencing in criminal cases. *See, e.g., State v. Formaro*, 638 N.W.2d 720, 724–25 (Iowa 2002) (we overturn sentencing decisions only if the sentencing court considered inappropriate factors and, consequently, abused its discretion); *State v. Jacobs*, 607 N.W.2d 679, 690 (Iowa 2000) (trial court must provide reasons underlying sentencing decision "to allow appellate review of the trial court's discretionary action"); *State v. Boltz*, 542 N.W.2d 9, 11 (Iowa Ct.App.1995) (appellate court examines reasons articulated by district court to determine whether discretion abused).

■ The failure of an agency to act based upon the perceived lack of legal authority to act and the failure of an agency to act based upon the exercise of discretion are different concepts. They may both be reasons for the failure to act, but the lack of authority to act does not implicate the exercise of agency discretion because there can be no discretion to exercise if there is no authority to act. Thus, judicial review of the authority of an agency to act does not undermine agency decision-making, or meddle in the wisdom of agency decision-making. For this reason, we do not believe the denial of rulemaking based upon the lack of legal authority falls within the "on the merits" requirement, unless the agency has no legal authority to act. Yet, this requires a judicial determination. *See Hamilton v. City of Urbandale*, 291 N.W.2d 15, 19 (Iowa 1980) (the interpretation of a statute can only be determined by the judiciary). Courts do not invade the discretion of the agency by examining the legal authority to act, and an agency that has authority to act but fails to exercise that authority based upon a false belief that there is no such authority abuses its discretion. Consequently, we are obligated in our review of this case to address the question whether the secretary of agriculture is legally authorized to promulgate the proposed rule to determine if discretion was exercised in denying the request for rulemaking. An administrative decision that denies rulemaking based on the lack of legal authority to promulgate the rule is not "on the merits" when the legal authority to act has not been judicially determined.

## IV. Legal Authority to Regulate the Percentage Content of Ethanol in Gasoline.

■ Any "rule adopted by an agency must be within the scope of powers delegated" to the agency by the legislature to be valid. *Iowa–Ill. Gas & Elec. v. Iowa State Commerce Comm'n*, 334 N.W.2d 748, 752 (Iowa 1983). Thus, we must consider whether our legislature has empowered the secretary of agriculture with authority to adopt a rule requiring gasoline sold in Iowa to contain ten percent ethanol.

■ The petitioners claim the rulemaking authority at issue in this case arises from Iowa Code section 214A.2(1) (1999). This section, entitled "Tests and standards," provides:

The secretary shall adopt rules pursuant to chapter 17A for carrying out this chapter. *The rules may include, but are not limited to, specifications relating to motor fuel or oxygenate octane enhancers.* In the interest of uniformity, the secretary shall adopt by reference or otherwise specifications relating to tests and standards for motor fuel or oxygenate octane enhancers, established by the American society for testing and materials (A.S.T.M.), unless the secretary determines those specifications are inconsistent with this chapter or are not appropriate to the conditions which exist in this state.

Iowa Code § 214A.2(1) (emphasis added).

Clearly, this section authorizes the secretary of agriculture to adopt rules to carry out the motor vehicle fuel statutes, and specifically authorizes the secretary to promulgate rules relating to specifications for motor fuel or oxygenate octane enhancers. Ethanol is an oxygenate octane enhancer. *Id.* § 214A.1(3). Thus, the authority to promulgate rules extends to ethanol as well. Yet, the question is whether this statute grants the authority to regulate the specific content of ethanol in motor vehicle fuel.

We begin by observing chapter 214A governs motor vehicle fuel in a broad manner. It covers such matters as tests and standards, shipment and delivery, sales, inspection and sampling, dealer permits, storage, and notices. *See id.* §§ 214A.2(1), .4, .5, .7, .12, .15, .16. It also proscribes certain prohibitive acts, *id.* § 214A.8, and authorizes the secretary of agriculture to employ chemists to carry out the provisions of the chapter, *id.*

§ 214A.13. Section 214A.2(1) generally grants the secretary rulemaking authority to carry out these provisions. Yet, there is no specific grant of authority by the legislature in section 214A.2 permitting the secretary to regulate the content level of ethanol in motor fuel. The closest provision in section 214A.2 is that portion of the statute that mentions "specifications relating to motor fuel or oxygenate octane enhancers." *Id.* § 214A.2(1). Thus, we must consider whether the "Tests and standards" section expresses the intent of our legislature to give the secretary authority to regulate ethanol content.

The petitioners assert the term "specifications" is broad enough to include the regulation of the amount of ethanol in motor fuel because the ethanol content relates to the contents or characteristics of motor fuel. *See* Black's Law Dictionary 1399 (6th ed.1990) (defining specification "[a]s used in the law relating to … manufacturing … [to be] a particular or detailed statement, account, or listing of the various elements, materials, dimensions, etc. involved"). Yet, it is clear that the term "specifications," as applied to motor vehicle fuel, actually relates to the requirements for a product to be called motor fuel or gasoline.

The definition of motor fuel under Iowa law is general and nontechnical. It means "a substance or combination of substances which is intended to be or is capable of being used for the purpose of propelling or running by combustion any internal combustion engine and is kept for sale or sold for that purpose." Iowa Code § 214A.1(2). Similarly, oxygenate octane enhancers are merely defined as "oxygen-containing compounds, including … ethanol." *Id.* § 214A.1(3). Ethanol is not defined. Thus, to determine whether a product is motor fuel or ethanol, it is necessary to rely on objective standards. *See United*

*States v. Coastal Ref. & Mktg., Inc.,* 911 F.2d 1036, 1039 (5th Cir.1990). One common standard specification for automobile gasoline is derived from specifications articulated by the ASTM. *Id.* This specification was " 'established on the basis of the broad experience and close cooperation of producers of gasoline, manufacturers of automotive equipment, and users of both,' [and] provides guidance 'in establishing the requirements of gasoline for ground vehicles equipped with spark-ignition engines.' " *Id.* The specification was established to help determine whether a product is " 'commonly or commercially known . . . as gasoline.' " [3] *Id.*

The ASTM standard essentially identifies the characteristics of gasoline, and then establishes objective standards for each characteristic. *Id.* The characteristics include "sulphur content, gum content, vapor pressure, oxidation stability, and octane content." *Id.*

Thus, specifications for motor fuel, and ethanol, apply as definitions, and relate to the essential characteristics of the product to be called motor fuel or ethanol, not the amount of ethanol to be blended with the gasoline. This means, in the context of motor fuel rulemaking, "specifications" relate to the adoption of standards that ensure the product constitutes gasoline or ethanol. This approach is consistent with the language of section 214A.2(1) indicating the secretary should normally adopt the ASTM specifications.

If our legislature had wanted to grant rulemaking authority to extend beyond the adoption of definitional standards and include the regulation of the percentage of ethanol in motor fuel, we think it would not have done so under the guise of the specification language used in the statute. Instead, we believe the legislature would have provided for the regulation of the blending of ethanol in motor fuel. For example, we observe that after Congress learned of the health problems with lead in gasoline, it gave the Environmental Protection Agency specific authority under section 211(c)(1)(A) of the Clean Air Act to promulgate regulations to control or prohibit the sale of fuel or additives that endanger the public health. *See Ethyl Corp. v. E.P.A.,* 541 F.2d 1, 11 (D.C.Cir. 1976) (citing 42 U.S.C. § 1857f–6c(c)(1)(A) (1970)).

Additionally, the legislature amended section 214A.2(1) in 1989 to add the provision indicating the rules may include "specifications relating to motor fuel or oxygenate octane enhancers." 1989 Iowa Acts ch. 75, § 2 (codified at Iowa Code § 214A.2(1) (1989)). Yet, there was no indication in the predicate bill of any intent to grant the secretary of agriculture rulemaking authority to determine the amount of ethanol in gasoline. Instead, the explanation of the bill merely indicates that ethanol is now included within the definition of oxygenate octane enhancer and the department of agriculture may set standards for oxygenate octane enhancers, test oxygenate octane enhancers, and regulate dealers. H.F. 254, 73d G.A. (Iowa 1989). This legislative history is instructive and assists in our search for legislative intent. *See Richards v. Iowa Dep't of Revenue,* 362 N.W.2d 486, 488 (Iowa 1985) (legislative history is instructive and can be considered in determining legislative intent).

---

**3.** "Gasoline" is broadly defined in ASTM D4806–98(3.1.2) as "a volatile mixture of liquid hydrocarbons, generally containing small amounts of additives, suitable for use as a fuel in spark-ignition, internal combustion engines." *See Coastal Ref. & Mktg., Inc.,* 911 F.2d at 1039 n. 4 (referring to ASTM D439, which is currently found in ASTM D4806–98(3.1.2)).

We also observe that the Secretary of Agriculture interpreted the statute to preclude rulemaking authority over the amount of ethanol in motor fuel. Although not binding, we give some deference to an administrative agency's interpretation of a statute it administers. *See State v. Vargason*, 607 N.W.2d 691, 695 (Iowa 2000).

Petitioners alternatively claim the rulemaking authority to establish the ethanol content of gasoline is derived from the general powers and duties of the secretary of agriculture set forth in section 159.5(11). This section establishes the secretary of agriculture as the "head of the department of agriculture and land stewardship," Iowa Code § 159.5, and authorizes the secretary, as part of her powers and duties, to

> [e]stablish, publish, and enforce rules not inconsistent with law for the enforcement of the provisions of subtitles 1 through 3 of this title, excluding chapters 161A through 161C, and for the enforcement of the various laws, the administration and supervision of which are imposed upon the department.

*Id.* § 159.5(11). Subtitle one includes chapter 159A, which concerns renewable fuels and coproducts. This chapter establishes the office of renewable fuels and coproducts within the department of agriculture. *Id.* § 159A.3(1). The "chief purpose of the office is to further the production and consumption of ethanol fuel in [Iowa]." *Id.* § 159A.3(3)(*a*). Nevertheless, these chapters define broad goals and do not address the grant of rulemaking authority to establish the ethanol content in gasoline, or express any legislative intent for the secretary to engage in such rulemaking. Neither chapter 159 nor chapter 159A provide legal authority for the secretary of agriculture to adopt the rule proposed by the petitioners.

## V. Conclusion.

We conclude the secretary of agriculture is not authorized to promulgate rules relating to the percentage content of ethanol in motor fuel sold in Iowa. There is no legislative grant of such authority.

**AFFIRMED.**